Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )   NO. 3:21-cr-00374-MMC-2
                               )
JOSEPH HUFFAKER,               )
                               )
            Defendant.         )
_____)

                    San Francisco, California
                    Monday, July 7, 2025

              **TRANSCRIPT OF PROCEEDINGS**

          **(EXCERPT - BRENDON "JACY" TATUM)**

**APPEARANCES:**

For Plaintiff:
                      CRAIG H. MISSAKIAN
                      United States Attorney
                      1515 Clay Street
                      Oakland, California 94612
                 BY:  **ABRAHAM H. FINE**
                      **BENJAMIN K. KLEINMAN**
                      **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                      FERRONE LAW GROUP, APLC
                      4333 Park Terrace Drive - Suite 200
                      Westlake Village, California 91631
                 BY:  **RICHARD CEBALLOS**
                      **ROBERT L. BAUMANN**
                      **ATTORNEYS AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

1    <u>APPEARANCES</u>:   (CONTINUED)

2    Also Present:        Special Agent Duncan Haunold, FBI
                          Veronica Hernandez, Paralegal
3                         Michael Easter, Investigator

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## I N D E X

Monday, July 7, 2025 - Volume

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|

**TATUM, BRENDON**
(SWORN)                                          4
Direct Examination by Mr. Fine                   4

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 70 | | 13 | |
| 171 | | 16 | |

 1   <u>**Monday - July 7, 2025**</u>                           <u>**3:33 p.m.**</u>

 2                         <u>P R O C E E D I N G S</u>

 3                            ---o0o---

 4                         (Begin Excerpt.)

 5        (Brendon "Jacy" Tatum steps forward to be sworn.)

 6            **THE COURT:**  All right.  Mr. Tatum, will you come up to

 7   the stand, please, and please remain standing till you're

 8   sworn.

 9            **THE COURTROOM DEPUTY:**  Raise your right hand.

10                         <u>**BRENDON TATUM**</u>,

11   called as a witness for the Government, having been duly sworn,

12   testified as follows:

13            **THE WITNESS:**  Yes, ma'am, I do.

14            **THE COURTROOM DEPUTY:**  Please be seated.

15            **THE WITNESS:**  Thank you.

16            **THE COURTROOM DEPUTY:**  Please state your full name for

17   the record and spell your full name, please.

18            **THE WITNESS:**  Yes, ma'am.  It's Brendon Jacy Tatum.

19   B-R-E-N-D-O-N, and last is Tatum, T-A-T-U-M.

20            **THE COURT:**  And Jacy is J-A-C-Y?

21            **THE WITNESS:**  Yes, ma'am.

22            **THE COURT:**  All right.  Thank you.

23            All right.  Whenever you're ready.

24                         <u>**DIRECT EXAMINATION**</u>

25   \\\

1    BY MR. FINE:

2    Q.   Good afternoon, Mr. Tatum.

3    A.   Good afternoon, sir.

4    Q.   Did you previously work as a police department [sic] for

5    the Rohnert Park Department of Public Safety?

6    A.   Yes, I did.

7    Q.   While you were working as a police officer, did you commit

8    federal crimes?

9    A.   I did, yes, sir.

10   Q.   Have you pled guilty to committing federal crimes?

11   A.   I have.

12   Q.   Did you commit extortion under color of official right in

13   2015 and 2016?

14   A.   I did.

15   Q.   During the 2015, 2016 time frame, did you commit those

16   crimes by yourself or with other people?

17   A.   With other people.

18   Q.   I'm talking about the 2015, 2016, time frame.

19   A.   I'm sorry.  By myself, yes.

20   Q.   Separately, did you plead guilty to conspiracy to commit

21   extortion under color of official right in December of 2017?

22   A.   I did, yes, sir.

23   Q.   And did you also plead guilty to conspiracy to obstruct

24   justice, falsifying records in February of 2018?

25   A.   I did, yes, sir.

1  Q.   For those 2017 and 2018 crimes, did you commit them by

2  yourself or with other people?

3  A.   With other people.

4  Q.   Who did you commit those crimes with?

5  A.   With Joe Huffaker.

6  Q.   Do you see Joseph Huffaker in the courtroom today?

7  A.   I do.

8  Q.   Can you please point to him and identify an article of

9  clothing that he's wearing?

10 A.   Yes, seated at defense counsel table wearing a blue shirt

11 and a blue tie.

12       **MR. FINE:**  Your Honor, may the record reflect that the

13 witness has identified the defendant.

14       **THE COURT:**  It may.

15 **BY MR. FINE:**

16 Q.   Now, Mr. Tatum, we're going to get into that in a bit.

17 But before that, I want to ask you a few background questions.

18       How old are you?

19 A.   43.

20 Q.   Where did you grow up?

21 A.   In Sonoma County, Rohnert Park.

22 Q.   Where is Rohnert Park?

23 A.   45 minutes north of San Francisco.

24 Q.   Where did you go to high school?

25 A.   Rancho Cotate High School.

**TATUM - DIRECT / FINE**

1    **Q.**    Maybe you could spell that for the court reporter.

2    **A.**    Rancho, R-A-N-C-H-O, C-O-T --

3            **THE COURT:**  A.

4            **THE WITNESS:**  -- A-T-E.

5            **THE COURT:**  I?

6            **THE WITNESS:**  There's no "I," like the city Cotati.

7            **THE COURT:**  They spell it differently?

8            **THE WITNESS:**  Yeah, they do.  C-O-T-A-T-E, Cotate.

9    **BY MR. FINE:**

10   **Q.**    Mr. Tatum, did you attend college?

11   **A.**    I did, yes, sir.

12   **Q.**    Where?

13   **A.**    Santa Rosa at the Santa Rosa Junior College.

14   **Q.**    And when did you -- when did you join the Rohnert Park

15   Department of Public Safety?

16   **A.**    2004, 2005.

17   **Q.**    And is it okay if I refer to it as RPDPS?

18   **A.**    Yes.

19   **Q.**    Does RPDPS have both a police division and a fire

20   division?

21   **A.**    They do, yes, sir.

22   **Q.**    What's the relationship between the police division and

23   the fire division?

24   **A.**    The upper command staff is where the City saves money.  So

25   there's a director that overseas both police and fire; but the

1   officers are firefighters, so they're sworn to do both, fire

2   and police.

3   **Q.**   And so do officers rotate between both fire and police?

4   **A.**   Yes, sir.

5   **Q.**   Can you describe how that rotation works?

6   **A.**   Yes.  There's yearly assignments or three-year

7   assignments, depending on the division, that you could be

8   assigned to.

9           As a firefighter, fire captain, or detective, or K9 or

10  specialty in the patrol division, motorcycle.

11  **Q.**   During your time at RPDPS, did you rotate between the

12  police and fire departments?

13  **A.**   I did, yes, sir.

14  **Q.**   Now, Mr. Tatum, I want to turn to your relationship with

15  Joseph Huffaker.

16  **A.**   Okay.

17  **Q.**   Turning your attention to specifically 2012, did Joseph

18  Huffaker join the department during that year?

19  **A.**   He did, yes, sir.

20  **Q.**   Before 2012, what relationship, if any, did you have with

21  the defendant?

22  **A.**   None.  Just knew of him through my cousins who went to

23  college with him.

24  **Q.**   After Mr. Huffaker joined the department, how did your

25  relationship develop?

1    **A.**    We became close hunting and fishing and working together.

2    **Q.**    So you had both a professional and a personal

3    relationship; is that right?

4    **A.**    Yes, sir.

5    **Q.**    Can you describe your personal relationship?

6    **A.**    Yes.  We both had kids in similar ages.  My daughter Emily

7    and his daughter Ellie were fairly close.  Our wives got along

8    really good.  Joe and I would go on hunting trips, and our

9    wives would hang out together.  We'd do barbecues, birthdays.

10   We were fairly close.

11   **Q.**    And you mentioned -- you mentioned hunting.  You mentioned

12   barbecues.  Any other activities you would do together?

13   **A.**    Just regular socializing, dinners or stuff like that.

14   **Q.**    Turning to work, how often would you see Mr. Huffaker at

15   work?

16   **A.**    If him or I were on duty at the same time, we'd probably

17   see each other at least once a shift.  But if we weren't on the

18   same shift or working in the same division, then we probably

19   wouldn't see each other.

20   **Q.**    Did you ever work a fire shift together?

21   **A.**    Yes.

22   **Q.**    I mean, what was the fire shift like?

23   **A.**    The fire division had Kelly schedule, which is a

24   two-by-four.  So you'd be on for 48 hours together and then

25   off.  So we'd spend two to three days together, if there's

1  overtime or you get held over, so we'd live together for

2  two-days-plus at a time.

3  **Q.**    And did you do police work together?

4  **A.**    We did.

5  **Q.**    Can you describe that?

6  **A.**    Yes.  We were on the same shift.  I believe he was working

7  for me as an officer when I was a sergeant.  Or we'd be in

8  opposite shifts different times, but we'd see each other, get

9  coffee when we were working, or run calls together, show up on

10  the same call.

11  **Q.**    I mean, would you ride in the same police car when you

12  were working together?

13  **A.**    Not on patrol, no.

14  **Q.**    Okay.  Now, when you were working interdiction, would you

15  work in the -- ride in the same police car during that time?

16  **A.**    Yes, sometimes, yes.

17  **Q.**    Okay.  So I'd like to turn to interdiction now.

18          Turning your attention to the 2014 time frame, around

19  that time period, did the department start the interdiction

20  team?

21  **A.**    They did, yes.

22  **Q.**    And what is interdiction?

23  **A.**    Interdiction is a police word for intercepting illegal

24  contraband or stopping the flow of illegal contraband.  It

25  could be in a plane, car, train -- just interrupting the

1    illegal flow of contraband.

2    **Q.**    And how did that apply to the Rohnert Park Department of

3    Public Safety?

4    **A.**    We conducted highway interdiction on -- mostly on US 101.

5    **Q.**    And can you describe that a little more?  What's highway

6    interdiction?

7    **A.**    Yes.  So we teamed up in two- or three-man vehicles and we

8    would work from Rohnert Park to Cloverdale and stop vehicles

9    that we suspected were involved in criminal activity once we

10   obtained probable cause to stop, like a -- an infraction or

11   some type of moving violation -- and contact the occupants to

12   see if they were involved in illegal activity.

13   **Q.**    So I'm going to turn a little more to that in a minute,

14   just kind of the specifics of interdiction.

15          But what was your title as it pertained to the

16   interdiction team?

17   **A.**    At first I was just an officer assigned to it.  And as

18   time progressed, I was the sergeant in charge of the

19   interdiction team.

20   **Q.**    What were your duties as the sergeant in charge of the

21   interdiction team?

22   **A.**    Scheduling days to go out, overtime, making sure reports

23   were turned in, court appearances, evidence -- probably other

24   things I'm leaving out, but that's what I can remember now.

25   **Q.**    Just to generally supervise the team, is that about right?

1  A.    Yes, sir.

2  Q.    And while you were the sergeant, did you still go out and

3  conduct interdiction stops yourself or with -- with another --

4  with another officer?

5  A.    I did, yes, sir.

6  Q.    What Mr. Huffaker on the interdiction team?

7  A.    He was, yes, sir.

8  Q.    Who was the commander of the interdiction team?

9  A.    Jeff Taylor.   Commander Jeff Taylor.

10 Q.    And just to better understand the structure, to whom did

11 Jeff Taylor report?

12 A.    To the director or the chief, Brian Masterson.

13 Q.    Turning your attention to the 2016 time frame,

14 interdiction was fully up and running at this point; is that

15 right?

16 A.    It was, yes, sir.

17 Q.    Were officers eligible to get paid overtime for

18 interdiction work?

19 A.    Yes.

20 Q.    And what does it mean to get paid overtime?

21 A.    That would be hours worked outside your regular schedule

22 that you would sign up to work for that you would submit an

23 overtime slip stating that you worked however many hours

24 outside your base pay for that week.

25 Q.    And would you get paid 1.5 times your salary for those

TATUM - DIRECT / FINE

1   hours doing overtime?

2   **A.**   Yes, sir.

3          **MR. FINE:**  Ms. Hernandez, if you could please put up

4   on the screen Exhibit 70.

5          **MS. HERNANDEZ:**  Exhibit 7-0?

6          **MR. FINE:**  7-0, yes.

7          And, Your Honor, this is a stipulated exhibit so we'd

8   move to admit.

9          **THE COURT:**  You're offering it?

10         Hello?  Are you offering it?

11         **MR. FINE:**  Yes.  Yes, Your Honor.  I apologize.

12         **THE COURT:**  All right.  70 is admitted.

13      (Trial Exhibit 70 received in evidence.)

14         **MR. FINE:**  Thank you.  And if we could publish that to

15   the jury.

16  **BY MR. FINE:**

17  **Q.**   Mr. Tatum, do you -- do you recognize this e-mail?

18  **A.**   I do, yes, sir.

19  **Q.**   And is that your e-mail at the top as the sender?

20  **A.**   It is, yes, sir.

21  **Q.**   And the date is August 15, 2016?

22  **A.**   Correct.

23  **Q.**   And who was this e-mail sent to?

24  **A.**   To basically everybody on the interdiction team,

25  Commander Taylor, and then one of the other commanders that

1    sometimes oversaw interdiction when Taylor was absent.

2    **Q.**    And so in the "To" line, these are the members of the

3    interdiction team; is that right?

4    **A.**    Correct.

5    **Q.**    And do you see Joe Huffaker's e-mail address on there?

6    **A.**    Yes, I do.

7    **Q.**    And can you read the subject of the e-mail?

8    **A.**    Yes.  The subject is "New Interdiction Code for Overtime

9    worked."

10   **Q.**    And then it's a pretty short e-mail.  Can you just read

11   the body of the e-mail?

12   **A.**    Yes.  (as read):

13           "Hey guys, when filling out your OT for any

14       interdiction-related time worked, please use the code

15       OTINT in the payment code section.  This will allow

16       our time to be tracked from our budget of 40K.  Thank

17       you guys, Jacy."

18   **Q.**    Was it important to correctly document your interdiction

19   overtime on your time sheets?

20   **A.**    Yes.

21   **Q.**    Why is that?

22   **A.**    To make sure we were working the correct hours and we had

23   a budget to follow and make sure we stayed within the 40,000

24   and make sure everybody got paid for working.

25   **Q.**    Well, that was going to be my next question.  Would you

1  get -- would you get paid for time spent doing interdiction if

2  you didn't note it appropriately on your time sheets?

3  **A.**   No, you would not.

4  **Q.**   And I assumed when you worked interdiction, you wanted to

5  get paid; right?

6  **A.**   Yes, sir.

7          **MR. FINE:**  Give me one second.

8                  (Counsel conferring.)

9          **MR. FINE:**  Ms. Hernandez, could you please show the

10 defendant -- or sorry -- show the witness Exhibit 171.  And if

11 you could turn to page 77 of the document.

12         And this is one we have a stipulation of authenticity

13 on.

14         **THE COURT:**  I'm sorry.  This is what?

15         **MR. FINE:**  I believe we have a stipulation on this

16 one.

17         **MR. CEBALLOS:**  Sure.

18         **MR. FINE:**  Yes.

19         **THE COURT:**  If you do, would you just say, "I've got a

20 stipulated exhibit.  I'd like to admit it.  It's 171," or

21 whatever.

22         And if so, then, why are you showing it to the witness

23 and not the jury?

24         **MR. FINE:**  Understood, Your Honor.

25         **THE COURT:**  All right.  So are you offering this

TATUM - DIRECT / FINE

1   exhibit?

2              MR. FINE:  Yes, Your Honor.

3              THE COURT:  All right.  171 is admitted.

4         (Trial Exhibit 171 received in evidence.)

5              THE COURT:  Okay.  Do what you want with it.

6              MR. FINE:  Thank you, Your Honor.

7              If we could publish that to the jury.

8              THE COURT:  Go ahead.

9   BY MR. FINE:

10  Q.   Mr. Tatum, what is this document?

11  A.   This is one of the time sheets that I submitted for the

12  week of December 10.

13  Q.   And I'm looking at the top right corner of the document,

14  you said December 10, and what -- is police or circled fire --

15  is police or fire circled?

16  A.   This is police hours worked.

17  Q.   And looking at the bottom left corner, do you see a 2016

18  date there?

19  A.   I do, yes, sir.

20  Q.   So is this time sheet from the week ending December 10,

21  2016?

22  A.   Yes, it is.

23  Q.   Mr. Tatum, can you describe the various rows and columns

24  on this time sheet?

25  A.   Yes.  There's a payment code, which is on the far left.

1    There's the days of the week, Sunday through Saturday.  Total

2    hours that were worked.  The supervisor's initials, any

3    comments.  And then following down is the totals worked for

4    each day.  Then it would have been my signature -- excuse me --

5    my name, signature, and the supervisor's signature.

6    **Q.**   And then looking at the payment codes, there's one at the

7    bottom called "EP/INT."

8             Do you see that?

9             The payment code on the left side of the document.

10   **A.**   I do not see it.

11   **Q.**   So -- I'm sorry.  So under "payment code," do you see your

12   name, "Tatum"; right?

13   **A.**   Yes.

14   **Q.**   And then under that you see "payment code," right

15   underneath?

16   **A.**   Yes.

17   **Q.**   And then there's a bunch of rows with various letters in

18   them?

19   **A.**   Yes.

20   **Q.**   And then at the bottom, the last row, do you see "EPINT"?

21   "EP/INT"?

22            **THE COURT:**  Do you want to walk up there --

23            **THE WITNESS:**  Oh, I'm sorry.  Yes.  I was looking at

24   the very bottom.

25            Yes.  In my handwriting, yes.

1    BY MR. FINE:

2    Q.    I apologize.    I was probably inexact with my description.

3          And then on the right side of that row, for comments

4    it says "Interdiction"; right?

5    A.    Yes, sir, it does.

6    Q.    And so those are the hours you worked for -- on

7    interdiction during that -- that week; is that right?

8    A.    Yes, it is.

9          MR. FINE:    Ms. Hernandez, could we go to the next

10   page?

11   BY MR. FINE:

12   Q.    Mr. Tatum, what -- what are these slips?

13   A.    These correspond to the overtime that we put on our

14   timecard.    These are the actual overtime slips that we fill out

15   that correspond to the same hours worked.

16   Q.    And the top one says December 5; right?

17   A.    Yes, it does.

18   Q.    And the next one, December 6, and so on?

19   A.    Yes.

20   Q.    And then in the comments section, the one on the top says

21   "Interdiction/Court Time"; is that right?

22   A.    Yes, sir.

23   Q.    And then the next one says "Interdiction Court"?

24   A.    Yes.

25   Q.    And then the bottom two say "Interdiction"?

1    **A.**    Yes, they do.

2    **Q.**    What does the supervisor's signature line mean?

3    **A.**    That would have been the supervisor that I was working

4    under at that time.

5    **Q.**    So if you were going to get paid overtime for doing

6    interdiction, would you need to fill out one of these slips?

7    **A.**    Absolutely, yes, sir.

8    **Q.**    And have it signed by your supervisor?

9    **A.**    Correct, yes, sir.

10           **MR. FINE:**    And, Ms. Hernandez, if we could go to the

11    next page.

12    **BY MR. FINE:**

13    **Q.**    Is this the time sheet for the next week ending in

14    December 17 of 2016?

15    **A.**    Yes, it is.

16    **Q.**    And looking again at the payment code, the last row of the

17    various letters, do you see "EP" there?

18    **A.**    I do.

19    **Q.**    And it says 12 hours?

20    **A.**    Yes, sir, it does.

21    **Q.**    And then "Interdiction" on the right?

22    **A.**    Yes.

23           **MR. FINE:**    And if we could go to page 82 of the

24    document, please.

25    \\\

1   BY MR. FINE:

2   Q.   And similarly, is this your interdiction slip for that --

3   for that date?

4   A.   Yes, it is.

5        MR. FINE:  We can take that down, I think, now.

6   BY MR. FINE:

7   Q.   Did you ever discuss the benefits of interdiction-related

8   overtime with Mr. Huffaker?

9   A.   I did.

10  Q.   What, if anything, did he say about that?

11  A.   That it benefited us and people of interdiction, that

12  worked interdiction because we got paid extra hours for working

13  interdiction.

14  Q.   Fair to say it was a way to make extra money?

15  A.   Yes.

16  Q.   Where did the interdiction team operate?  And you

17  described this a little, but can you give us some detail on

18  where the interdiction team would operate?

19  A.   Yes, sir.  Mostly north of our city, on Highway 101

20  between Cloverdale and the Mendocino County border, just right

21  before Hopland, California.

22  Q.   And why did you operate there?

23  A.   That was the area we had the most success.  There was less

24  traffic.

25  Q.   When you say "most success," what do you mean?

1  **A.**   It's hard to look at so many cars at one time.  So up

2  there, there's a lot less cars to look through, which allowed

3  us to have better success on stopping vehicles that had illegal

4  contraband on them.

5  **Q.**   When you conducted interdiction outside of the Rohnert

6  Park city limits, for instance, let's say you did it in

7  Cloverdale or somewhere up north, did you let those

8  interdic- -- those jurisdictions know that you were conducting

9  interdiction there?

10  **A.**   We did, yes, sir.

11  **Q.**   Why was that?

12  **A.**   To allow them kind of a courtesy that we're in their area

13  working, if we needed backup, if something happened.  And also

14  if we needed a K-9 assistance.  A lot of times there was a K-9

15  close by.  But mostly officer safety, to let them know that we

16  were up there working the highway.

17  **Q.**   So was it kind of for your own officer safety?

18  **A.**   Yes, sir.

19  **Q.**   And is that like if you needed backup or something like

20  that, something happened during a traffic stop, you wanted --

21  you needed help with something like that?

22  **A.**   Correct.  Yes.

23  **Q.**   When you were working interdiction, how would you go about

24  determining which cars to stop?

25  **A.**   We would focus on vehicles that had out-of-county license

1  plate covers, so a vehicle license cover that wasn't from the

2  area.  Our training and experience when we went to school, they

3  taught us that it was mostly white males between 25 and 35,

4  were the average age of people that were trans- --

5  transporting [sic] contraband.  A lot of Toyota vehicles,

6  trucks, to move large amounts of marijuana and contraband.

7  Rental vehicles.

8  Q.   How could you tell if something was a rental vehicle?

9  A.   No license plate frame cover.  Usually very clean, an

10 American-made car, sometimes they would have an Enterprise

11 sticker on the side of them, but mostly very clean, no tint on

12 the windows.

13 Q.   And you mentioned some of these things you learned during

14 school; is that what you said?

15 A.   Yes.

16 Q.   What do you mean by "school"?

17 A.   I attended several classes in schools around the state,

18 and they were taught by expert witness -- or expert subject

19 matters in interdiction, and they would pass along their

20 knowledge and what they had success doing.

21 Q.   When you worked interdiction, did you drive both marked

22 and unmarked police cars?

23 A.   We did.

24 Q.   What determined whether you drove a marked or an unmarked

25 one?

1  **A.**    Availability of that vehicle, if there was an unmarked

2  car.  We had -- Rohnert Park has pool cars, so it was just if a

3  certain vehicle was available.

4  **Q.**    As the interdiction team progressed into 2016, were you

5  using predominantly unmarked cars for interdiction?

6  **A.**    Yes.

7  **Q.**    What did you typically wear when you worked interdiction?

8  **A.**    Jeans.  We had like a tac vast that had "police."  A

9  Rohnert Park soft cloth badge.  Sometimes we had a holster on

10  our vest or a thigh holster or a regular belt holster.  Said

11  "police" on the back.  Like I said, you would have either your

12  cloth badge or your badge on your belt.

13  **Q.**    So let's break that down a little bit.  You said there was

14  a cloth badge that you would wear on your -- on your vest; is

15  that right?

16  **A.**    Correct.

17  **Q.**    What did that cloth badge look like?

18  **A.**    It says "Rohnert Park."  It was gold, "Rohnert Park

19  Police."  Just a regular size, like a normal badge size, but it

20  was cloth instead of metal.

21  **Q.**    And then what was the other badge you were talking about?

22  **A.**    Our regular uniform badge that would usually go on the

23  outside of your uniform, but you could take it off and put it

24  on a belt keeper, and it would clip onto your belt or your

25  thigh holster.

1  **Q.**  And when you were doing legitimate interdiction work, were

2  you always wearing these Rohnert Park badges?

3  **A.**  Yes.

4  **Q.**  Was that department policy?

5  **A.**  It was.

6  **Q.**  When you worked interdiction shifts, who at the

7  department, if anyone, would you notify before going out?

8  **A.**  Dispatch for sure.  We'd either log onto our computer in

9  the car or call it and they would log us on.  Usually, the

10  commander knew if we were going out.  But if he was there, I'd

11  remind him or tell him we were going out.  That would be

12  notification like in-house, and then we talked about before

13  notifying other agencies if we were going to be up working in

14  that area.

15  **Q.**  So let's break that down a little bit.  You talked about

16  telling dispatch --

17         **THE COURT:**  Okay.  As long as you're getting

18  interrupted by Mr. Kleinman.

19         **MR. FINE:**  Yes.

20         **THE COURT:**  I do note that it is essentially 4:00, so

21  when you get to some point within this area that you're going

22  into -- because we're clearly not going to finish Mr. Tatum

23  this afternoon -- if you can find a logical place like to stop,

24  that would be good.

25         **MR. FINE:**  I think this is a fine place to stop, Your

```
 1   Honor.
 2           THE COURT:  You're sure?  I'm not trying to say you
 3   have to stop.
 4           MR. FINE:  I think right now is a fine place to stop.
 5           THE COURT:  Okay.  Fine.
 6                       (Time noted 4:02 p.m.)
 7                       (End of excerpt.)
 8                       ---o0o---
 9
10                   CERTIFICATE OF REPORTER
11           I certify that the foregoing is a correct transcript
12   from the record of proceedings in the above-entitled matter.
13
14   DATE:   Saturday, September 27, 2025
15
16
17
18
     _____
19     Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
               Official Reporter, U.S. District Court
20
21
22
23
24
25
```