STUART HANLON (CSBN: 066104)
LAW OFFICES OF STUART HANLON
635 Belvedere Street
San Francisco, CA 94117
(415) 225-5002
stuart@stuarthanlonlaw.com

Attorney for Defendant, Jacy Tatum

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRIC OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRENDAN JACY TATUM,<br><br>Defendant. | NO. CR 21-0374 MMC<br><br>**DEFENDANT TATUM'S SENTENCING MEMORANDUM**<br><br>Date:  May 6, 2026<br>Time: 2:15 p.m. |

INTRODUCTION

Jacy Tatum, who pled guilty to these charges in 2021, is finally before this Court for sentencing. He is a former Rohnert Park Police Department sergeant who joined the department in 2004, at the age of twenty-two. For more than fourteen years he served with distinction and received many honors. For reasons discussed in the Memorandum, he began a reign of criminal acts  that lasted over a year – extorting drugs from citizens  he stopped on the highway, stealing drugs,  and creating false reports to try to hide his crimes. He also failed to report his illegal income on his taxes. He abandoned his oath as a police officer to serve and protect, and let down his department, his community, his family and friends, and himself.

In the same Indictment, the Government also charged his best friend and co-worker Joe Huffaker with the same crimes. Tatum was the primary witness against Huffaker and testified at Huffaker's trial where he was convicted. Huffaker was involved in these crimes for a much shorter time -- approximately four months and profited minimally compared to Tatum. Clearly, Tatum is the more culpable of the two participants.

One way to approach the sentencing of Tatum is to ask three questions –- (1) why the Government used the more culpable heavy in this case to convict someone far less culpable? And (2) can the Court sentence Huffaker without knowing what the Government is recommending as an appropriate sentence for Tatum; and (3) must the Court consider the imposed sentence for Huffaker when sentencing Tatum -- thus linking the sentencing of each individual with the sentence of the other? These questions led the Court to postpone Huffaker's sentence so that the Court could sentence Mr. Tatum first.

Though these questions are appropriate and the Court should consider the answers in sentencing both defendants, they are not the only, or even the primary factors the Court must consider. In most cases, the difference in culpability and the need for comparative sentences would lead to a higher sentence for Tatum. But most cases are not this case --and this case is unlike most cases -- there are many factors that make the sentencing of Tatum different. As this Court knows, the Guidelines are not mandatory, and the sentencing Court must consider the individuals factors of each defendant facing sentencing.

The Presentence Investigative Report addresses this exact issue on page two of the Sentencing Recommendations of the Addendum and determines that Tatum's sentence should be independent of Huffaker's as follows :

"It is understood that Tatum is more culpable in the scheme than co-defendant Huffaker and normally that would warrant a higher sentence. However, Mr Huffaker chose to go to trial and deny any responsibility for his wrongdoing. Considering Tatum's early acceptance of responsibility, and not only his positive performance on pretrial release, but his positive attitude and consistent display of remorse throughout these proceedings, the recommended sentence for Tatum is being made independently of Mr Huffaker's recommended sentence."

Tatum's remorse and desire to change occurred early on. He agreed to plead guilty to a plea agreement for both he and Huffaker and agreed to accept a much longer sentence than Huffaker and there would be no cooperation. However, Huffaker refused to accept the agreement; and the Government advised Tatum this was a package deal, and he could not plead if Huffaker refused to enter a plea -- unless he agreed to cooperate and testify against Huffaker.

Initially, Tatum felt he could not testify against his co-defendant. Not only was Tatum Huffaker's supervisor, but they were best friends who hunted and fished together, and their families regularly got together. Tatum knew that cooperating against Huffaker would cut all these ties for himself, and his family. He also knew that the culture of law enforcement did not allow officers to ever or easily turn on each other. Tatum had been a police officer for his entire adult life and his friends and social life, and fabric centered around police officers and their culture. He knew that his cooperation would lead to him being ostracized by all of his friends and would end decades of long relationships.

Tatum did not go to the Government and say he wanted to testify against his friend. The Government made such cooperation a necessary part of Tatum admitting his guilt. If there is any question, why the more culpable person cooperated down against less culpable must

3

be addressed to the Government and cannot be used against Mr. Tatum to minimize his cooperation or increase his sentence.

Tatum's remorse, positive changes in his life, and tremendous rehabilitation over the eight years since the crimes occurred are documented in detail below. His codefendant followed a different path that does not appear to include acknowledgement and acceptance of his criminal acts. He went to a jury trial and may still maintain his innocence.

Mr. Tatum has no ill will towards Joe Huffaker and hopes he receives a fair, and, in fact, low   sentence.  But they have taken different paths after their criminal acts were exposed. Tatum only asks that his sentence be made independent of Huffaker's sentence and be based on all the relevant factors discussed herein.

MEMORANDUM

This Court is familiar with the facts of Mr Tatum's case, having reviewed the detailed recitals in the Pre-Sentence Report and the Statement of Facts in the Plea Agreement. Further, the Court has observed the trial of codefendant Huffaker and the lengthy direct and cross examination of Mr. Tatum.

Mr Tatum began his career in 2004 as Rohnert Park police officer and rose to the rank of Sgt and became head of the interdiction and forfeiture unit. In 2016, he, apparently inexplicitly, veered off his career path of service and honesty and began extorting marijuana (and on two occasions money) under color of law by threatening marijuana dealers, or those simply transporting marijuana, he stopped on Highway 101. He initially acted alone, stopped a number of drivers, seizing the drugs from their cars. The marijuana was sold by others and Mr Tatum profited almost $450,000. He deposited the cash he received in local banks, each deposit under

$10,000. In late 2017, codefendant Joe Huffaker, another Rohnert Park police officer under Tatum's command, joined Tatum in his criminal thefts. They were helped by a third person,( an unindicted coconspirator) not a police officer, who sold the pot and gave them the funds. They also created false police reports to hide their criminal acts, and Tatum failed to pay taxes on his illegal income of approximately $450,000.

Stealing from marijuana dealers on the highway, creating false reports to hide their crime, and not reporting income are serious violations of federal law. But the most serious consequences of Tatum's action were breaking his trust with the community he served and the other honest officers working with him and under him. He violated his oath to serve and uphold the law, using his badge and uniform, and the power that came with them, to commit his criminal acts. Mr Tatum will forever have to live with the consequences of this breach. He lost the only job he had ever had, his career, almost all of his friends, including his two best friends, and his reputation and the respect of many in his community.

A key question is what led an idealistic successful police officer, living his dreams of being a public servant and helping others, to become a criminal who abandoned his career and beliefs? And are the reasons why this happened relevant factors in this Court's determination of a just sentence?

TATUM'S BACKGROUND

Jacy was raised by a single parent – his mother- and never had any contact with his biological father. He knew his dad was a famous Oakland Raider football player who had another family. Tatum's mother attempted to connect him to his biological father, but Jacy's father did not want to ever meet his son.

They were poor, his mother's primary work was cleaning houses. She worked long hours and Jacy often stayed with friends and relatives. She did provide him a safe and loving home. He stayed out of gangs and away from drugs and alcohol. He excelled in sports, and after getting an AA degree he was accepted into the Rohnert Park Public Safety Department as both a fireman and police officer.  In 2004, at the age of 22, he completed the training at the Academy and became a police officer carrying firearms.

He became a highly respected and decorated police officer. He received many awards including ones from the Governor of California and the President of the United States. (see Exhibit 1) He married his high school love and had one child with her; her daughter from an earlier marriage lives with them. He had a third daughter whose mother kept them apart until she was eighteen, although he paid child support and sought to know his child. Once she turned eighteen, she reached out to him, and they are now in close contact.

He appeared to be living the American dream.


GUIDELINES AND VARIANCE

The probation officer's Guidelines determination is accurate–a range of 87-110 months in custody. The defense has no objections to her factual determinations. The probation officer then examined 3553 factors that could call for a variance. She details the effects on a 22-year-old officer eight months into the job shooting and killing, .in self-defense ,  an armed assailant at close range, leading to a documented diagnosis of PTSD and depression. The probation officer concludes all these factors led to a "convergence of stressors …. that contributed to the defendant's involvement in the instant offense."

Further, the PSI points out that Tatum has displayed "significant post – offense rehabilitation." As will be pointed out below, the extent of this rehabilitation is extraordinary. After considering these and other 3553 factors (discussed below) the probation officer concludes that this Court should not impose the Guideline Sentence but a sentence of 24 months. (This is recommended without considering that the Government will be filing a 5K motion reflecting Tatum's extensive cooperation).

3553 FACTORS

When determining the appropriate sentence for an individual defendant, a district court should impose the shortest sentence possible that, (1) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; (2) deters future criminal conduct; (3) protects the public from the defendant and (4) provides the defendant with the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

When determining whether a given sentence is sufficient to effectuate these purposes, district courts are directed to consider the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available, the defendant's guideline range, any relevant policy statements, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The Supreme Court in United States v. Booker, 543 U.S. 220 (2005), and the long line of cases in its progeny, do "not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." Nelson v. United States, 555 U.S. 350, 352

(2009). "The sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." Id. at 351. Instead, courts should calculate the Guidelines range, but then determine what sentence is actually appropriate for the specific individual in light of 18U.S.C. § 3553(a) factors and explain the variance from the former if justified by the latter. Id.

The sentencing court has the discretion to weigh mitigating factors that were previously deemed "not ordinarily relevant, such as age, education and vocational skills, mental and emotional conditions, employment records, and family ties and responsibilities." United States v. Ameline, 409 F.3d 1073, 1093 (9th Cir. 2005). The court may also consider personal characteristics such as drug and alcohol dependence, lack of guidance as a youth, and economic pressures. Id.; citing Koon v. United States, 518 U.S. 81, 98 (1996). Every convicted person is an individual, and every case is "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 52 (2007).

Given this law, the Probation Officer correctly examined the appropriate history and factors mandated by 3553

1. **The defendant has no criminal history** – this is true for all first-time offenders.

2. **The defendant grew up poor and without a father** Many people who find themselves facing criminal sentencing have grown up poor and without a father. What is unusual in this case is that Tatum's father was not dead nor had he disappeared. Rather he was a famous NFL football player who not only abandoned his son but refused to acknowledge or even meet with him. As a young teenager his mother brought him to meet his father at a card signing at Walmart. Tatum wore the same number on his football jersey as the one

his father wore while a Raider, and he hoped his father would want to see him play football on his high school team. His father refused to see him and never came to a game or reached out to him. This led to feelings of rejection, and loss of confidence.

These feelings were magnified by the fact that Tatum grew up as a mixed-race child in an almost all white suburban community – he was one of the few black students in his high school and only the second black police officer in the history of Rohnert Park. His mom and her family were all white, and he was never able to connect to his father's family. He was isolated in his world as a young black man, feeling he did not belong in the black or white world, and always having to prove himself.

3.    **While a police officer, he was involved in two officer-involved shootings, one which ended with the suspect dead. He received little counseling and felt he was expected to get back to work as if nothing happened. The stress of the shooting and the day-to-day trauma he saw as an officer severely affected his mental health and family relationship**

When Tatum was eight months out of the police academy and 22 years old, he shot and killed an armed suspect in the line of duty, (the police report documenting this incident is provided to the Court as Exhibit 2 filed under seal). The PSI refers to a second shooting (non-fatal) in 2018. It took place at the police station and multiple officers shot the armed assailant in an incident described as attempted "suicide by cop." Since this occurred after the crimes in this case, counsel is not addressing it. This event explains why some of the medical records are in 2018 or 2019.

Following the 2005 shooting he was given less than a month off work. When he returned, he was given only minimal psychiatric help other than a five-day retreat with other first

9

responders who suffered emotional harm in the line of duty. The program worked directly with, and was funded by, law enforcement agencies. The records of the West Coast Post Trauma Retreat, Inc are submitted as Exhibit 3 under seal. Though the Initial Intake occurred on May 5, Tatum did not enter the program until June 13th and was discharged on 6/17/05—five days. The records show formulistic testing but very little treatment or actual counseling. Though he was diagnosed with PTSD or "partial PTSD" and his overall posttraumatic stress level was in the severe range, his discharge found he had improved, was appropriate, and was cleared for full-time work. The only follow up was to "contact a therapist for occasional F/U."   It appears that the point of the program was to clear him to return to active duty.

In 2005 officers in law enforcement were told to "man up", be tough and get back to work. Former police officer Matt Phillips, who worked with Tatum at the time, wrote a letter of support (Exhibit 4). In part he addresses what he saw after the shooting when Tatum quickly returned to work: "But the young man who returned was different, very different, then the boy who pulled that trigger. I saw it with my own eyes, and it was unmistakable. He was clearly hurting. He did his best to hide it, but it was painfully obvious to anybody who was paying attention. At that time, these things were not openly discussed in our department. It was a different time, and the culture of our department simply didn't allow for the perception of weakness. Jacy was encouraged in no uncertain terms to walk it off and get back to work. …. I could see that he would have problems in the future   …. But the transformation I saw could best be described as the formation of a callousness over his soul… that kept him from feeling the things that a compassionate man in a position of power should feel in order to do his job correctly. Or if he felt anything, he locked it down and buried it."

His mother and wife also saw the changes in Jacy. Please see the letters attached as Exhibit 5 (further discussed later).

Numerous doctors have documented that Mr. Tatum suffered from PTSD, primarily from this incident. The documents described below are being filed under seal collectively as Exhibit 6. They include a page of Kaiser records from 2006, Psychotherapy records of PHD Iverson Eicken in 2019; report of Dr Anish Shah, a psychiatrist who conducted an investigation for a Workers Compensation case in 2019; and a report and CV of Dr Jeff Gould, retained by Counsel to evaluate Mr Tatum in 2022. These records make clear that since 2005 Tatum has suffered from PTSD. Counsel only highlights a few of the findings as the reports in large part speak for themselves. The two reports that are most helpful are from Dr. Gould and Dr Shah.

Shah was seeing Tatum for a 2019 Workers Compensation case to determine if Tatum's disability was related to work issues or private lawsuits or the then possible criminal charges. He found that his employment was the primary cause of his disability. "I attribute 65% of the causation to chronic PTSD and clinical depression from cumulative trauma. His symptoms started with the first traumatic incident in 2005, and he has been on psychiatric medication from that time."

Dr Gould reviewed all of Tatum's medical records and talked to family members and determined that he suffered from PTSD, and Substance (alcohol) Use Disorder. He found that that 2005 shooting caused his PTSD and led to self-destructive behavior as a response to the shooting. The response "takes the form of dissociation, numbness to typical feelings, feeling lost, alone and disconnected from the feelings that accompany the experience of life.  The subsequent self-sabotaging behavior is a dysfunctional mechanism to produce feelings of control,

11

relief and calm or to feel real and alive. … This self-destructive behavior is commonly reported among combat veterans."

He concluded that "while his post traumatic related emotions from his workplace did not cause his behavior surrounding the offense, his emotional condition that resulted from the trauma allowed him to rationalize and validate his behavior to himself for a period of time." These medical records reflect a direct causal connection between the shooting in 2005, the lack of intervention and real treatment, and the changes in Mr. Tatum that led to the very different and damaged person who committed the instant offenses. He went from a young idealistic office to one who took a man's life and never truly recovered. He became an isolated, angry and self-destructive individual who lived in constant hyper vigilance.

Dr Gould's conclusions mirror the words of the PSI: "It seems a convergence of stressors coupled with alcohol abuse contributed to the defendant's involvement in the instant offense."

Without the drastic changes caused by the 2005 shooting, it is likely Tatum would not have committed these crimes. He still is responsible and made choices in part motivated by a desire for money. But the disease he suffered led directly to his fall from grace, the loss of his moral compass, and his destructive criminality.

4.     **He has performed well on pretrial release with no concerns or violations.**

The one issue raised is that in 2024 a non-criminal inspection search found an indoor marijuana grow in a barn on his rural property. When the police came, Tatum told them the identity of a tenant who rented the barn; that the marijuana plants in the barn were his, not Tatum's. Tatum did not have a key to unlock the barn and called the renter. He came to

unlock the barn and confirmed Tatum's statement: that it was his grow and Jacy had nothing to do with the plants or sale of pot.  Mr Tatum's error was not advising pretrial that a tenant was growing marijuana for clubs in his barn and asking if this was ok while on pretrial release. The local Sheriff investigated and filed no charges. Tatum immediately advised pretrial of the incident, and they took no action. The United States attorney was aware of the incident soon after it happened (by counsel) and took no action. Tatum showed bad judgement, but no one has considered it serious enough to bring any type of charges.

But this variance goes far beyond doing well on pretrial release: it is really "significant post-offense rehabilitation".  His offense occurred in 2016-2017, he lost his job in 2019, and he wasn't indicted until 2021. He has been on Pretrial Services Supervision for four years and it's been eight years since the offense.  This eight-year period has given this Court a meaningful period of time, or track record, to measure his rehabilitation and to determine if it is sincere, or an attempt to get a lower sentence. From all the available evidence it is overwhelming real change and rehabilitation.

When he was indicted, he lost his job with PG&E that he had since leaving the police force. He found himself unemployed, cut off from most of his former friends and from the entirety of the law enforcement fraternity that had been the basis of his social, personal, and employment network for 14 years. He began to drink more and isolate himself even from his family.

But between that low point and now, he has reinvented himself and reclaimed the young idealistic 22-year-old that existed prior to the 2005 shooting. He made these changes not through "finding god or religion" but through reconnecting with his family – wife, three daughters, his mom – and with his many remaining friends and the many he made since

2019. Without the stress of police work and with the love and support of these folks he found a new community that relieved some of his fear and isolation and a lessening of the worse symptoms of his PTSD.

From 2021 he became a stay-at-home dad to his two teenage daughters and reconnected with a daughter from whom he had been estranged. As a police officer he had continually worked and missed his family life and almost lost his marriage. Now he does everything with his daughters from making meals to coaching them, camping with them, and being involved with their school life. His problems with his wife are resolved and their marriage is much stronger.

His employment record is impressive. The PSI report documents the businesses he and his family have begun from selling eggs as a family at farmers market to becoming a mainstay in fighting fires, first through employment and then with a business he and his wife began with a loan to purchase trucks to haul water to fires. He presently has a multi-year contract with Cal Fire. Since 2024, he has been at the front lines of almost every major fire in California (documented by Probation). He also remains employed as a truck driver. Through this work fighting fires he now finds joy in serving the community in a meaningful way. His egg sales help him be connected to his girls as well as his community who meet with him weekly at the market.  He has stopped drinking for almost three years and continues with medication and therapy to deal with his PTSD and anxiety and depression.

He admitted his guilt almost immediately and agreed to plead guilty to end the case. As stated in the Introduction, he had no interest in cooperating but only did so when Huffaker refused to plead, and the Government informed him it was a package deal  he could not plead guilty unless he agreed  to cooperate against Huffaker and others.   He provided the

identity of the person who sold the drugs ( who also became a key witness at trial) As will be discussed his cooperation was complete and extensive. .

Not many of us see law enforcement members as humble or humbled. Their job demands self-assurance and arrogance - a belief in their ability to control any situation. As a police officer Tatum had these attributes, as seen in the videos of the stops on the highway. But those attributes no longer exist. His fall from his professional stature and reputation as a hero to being a disgraced convicted felon has humbled him. And his newfound humility has given him the ability to become a better and healthier person.

Soon after his plea Tatum arranged to borrow $500,000 from his grandmother, now deceased. He owes this money to her estate. These funds have remained in counsel's trust account since late 2021.Tatum has agreed to pay full restitution to the IRS, and the two documented victims of the extortions. All remaining funds of the half million dollars will be forfeited to the US government. Counsel will work with the US attorneys to provide payments prior to sentencing.

Mr Tatum has submitted a letter to the Court expressing his remorse. (See Exhibit 7) But no words from counsel, new jobs, restitution payments or words of remorse from Mr Tatum can really document his post offense rehabilitation and acceptance of responsibility. That documentation comes from the letters of family and friends talking about the person they now know. These many letters are from his wife, mother, and many of his new and old friends. And work relationships. Counsel hopes the Court will be able to review them all. (See Exhibit 8)

These letters, from persons from all walks of life, paint a mosaic of a man that cannot be fabricated. They all tell the same story in various ways and from various perspectives: a  young man who went into law enforcement optimistically to help others, but who

15

changed after killing a suspect and became a different person – cynical, angry, and isolated. After his arrest he slowly changed to the person who once was- someone working for his community and a person always there to help a friend.

From Marie Boyd: "Jacy is one of the only two people among all my friends that has never faltered on me, never missed a day of support, and has never once not followed through on what he says he will do – I truly believe in his future of being on the right path and doing good things. Which he had proven in all the time since his plea in 2019."

Ed Jones, who hired Jacy to fight fires. As for his work – He is always there when we need him….As a society we need Jacy and others like him to be there in our time of need. When I was on the fire line with Jacy, I could see how much he loved being able to serve again. Not just enjoying the work but a love of serving the community, one that he probably thought he had lost forever."

Letter from Kimberly Denno and her 17-year-old son Wyatt… "Jacy has taken Wyatt under his wing and become a father to him." Wyatt writes: "I do not know what will happen in the future. I do know that not having Jacy in my life every day will leave an empty hole that will not be able to be filled. (locking him up) will be devastating to me and everyone that knows Jacy."

Sterling Sanford-Mohar: "Jacy has supported my daughter who suffers from anxiety. His patience and encouraging manner have helped her grow in confidence, both on and off her horse…… He helped her push through her fear."

Darren Crawford: "He is deeply committed to being a positive example for his children and a contributing member of his community. He dedicates his time to helping others. His integrity and selflessness have earned my respect and trust."

16

Natalia Welter: "I have personally witnessed tremendous changes in Jacy. He developed a strong, stable, and happy marriage. I have seen him cry, be humbled, and find strength in faith and community.  He has found joy in simple honest work…. He has created a new and healthier identity, far removed from the culture he was once in."

Lucas Allen-Duenas hired Jacy after Jacy told him of his past: "On more than one occasion, he has gone out of his way to help strangers… These are small acts, but they reflect his willingness to serve others without being asked or expecting anything in return. … His integrity in the present, combined with his daily actions, demonstrated that he is committed to positive change."

Gabriel Watson – "Once when our family was struggling financially, Jacy stopped by with 2 grocery bags of food…... while I had problems in my marriage, Jacy allowed me to stay with his family at his home…. During covid, my wife and I were essential workers and Jacy many times offered to help with childcare. Jacy is one of the most caring friends and amazing fathers I have ever known….He inspires me to be better every time I see him."

Alexandra McSpadden: "Jacy has shifted into a more gentle, kind soul since he left the police, he has become a better father, husband and friend …. Most importantly, I have seen how he now parents his children through kindness, love and patience. I can't imagine the lasting damage it would do to these girls if he is imprisoned."

Kassie Tatum, wife: "When Jacy was no longer a police officer it seemed to me like a part of him died. He really did live for that job, but it was also killing him …I have witnessed how he has changed for the better. He accepts responsibility and shows deep remorse, and I believe he is committed to continuing on the path of growth and accountability. … I have

stood by his side not because I condone his actions, but because of the man I have seen him become. – the new Jacy."

Kathy Tatum, mother: "Jacy was involved in a shooting that changed his life forever. I will never forget how he was before that day, and how different he became afterward. He turned to alcohol, battled severe depression and anxiety….I lost the son I knew that day, and I watched helplessly as pain overtook him. …Losing his career and facing these consequences has, in many ways, saved my son's life. He has returned to the man I raised—the kind, giving and compassionate son who wants to do good in this world."

DISCUSSION

This case presents very complex and difficult competing values for sentencing. On the one hand, the crimes – and the breach of public trust by a law enforcement officer who with that trust is given the power of the badge, uniform and gun and then uses them to commit crime rather than to protect the community, cries out for punishment. The Government certainly will argue that a sentence of multi years of imprisonment is necessary to send the message to other law enforcement officers that you cannot take this criminal path.

But the law is clear that the Guidelines are advisory only, and the Court must consider any and all facts and circumstances about the defendant as an individual and about why the crime occurred, that may mitigate the sentence. The key is mitigating the sentence, not the crime.

The Government likely will argue about sentences in other cases where police commit crimes, and the need for conformity in sentences. They may well argue that Tatum's codefendant should get a lesser sentence even though he forced a trial and showed no remorse

18

because his crimes involved less victims and far less financial gain. Counsel addresses this issue in the Introduction. As Tatum's PSI report states on page 2 of the final sentencing recommendation, that, for the reasons stated therein, " the recommended sentence for Tatum is being made independently of Mr Huffaker's recommended sentence."

What these arguments miss is that each criminal defendant deserves to be sentenced individually with the Court considering factors that apply to that human being. As our Supreme Court eloquently stated:

Every convicted person is an individual, and every case is "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 52 (2007).

The defense supports the variance factors articulated by the Probation officer. They are valid and relevant to Jacy Tatum, presenting the facts and rationale for the variance to a sentence of 24 months. Counsel is aware of how unusual this variance is and expects the Government to argue it is unheard of and that it will send the message to the public that police officers are treated more leniently than non-law enforcement defendants.

In our present climate, law enforcement officers may often be treated more harshly than other defendants, though counsel really does not know what the reality is. The truth is that Jacy Tatum and other police persons should be treated like any other person charged with and convicted of a federal crime. The issue is not how "the public", whatever that term means, will respond. The issue is what is a fair and just sentence under the law.

The variance found by the experienced Probation Officer in this case comes from a place of objectivity, not the bias of counsel for the Government or Mr. Tatum. It is supported by the evidence that has been examined by the officer and the applicable law. It is not binding on

19

the Court, but it should, and does, in this and any case, weigh heavily in the Court's determination. The probation officer is the only neutral and unbiased party reporting to the Court, looking at all the available evidence through the lens of existing law.

The variance is supported by two main factors.  One, that a very young officer took another man's life. That it was in self-defense, that it was necessary, did not matter to Jacy Tatum. The fact of killing another human overwhelmed him. He should have received lengthy counseling and time off. But he did not. He was a young man in shock, scared, and suffering, and needed help and compassion. But what he got from his department was: man up, get back out there. His optimism turned to cynicism and joy at work turned to fear, anxiety, and then anger. It is uncontested that it quickly turned to untreated PTSD.

Most of us never have to experience killing someone, and don't know what it does to a person. We see in our veterans from Viet Nam, Afghanistan, Iraq and other wars what destruction it brings to many of them. It had that effect on this young policeman, and his job became a war zone in his mind.

It is not argued here that Tatum broke the law simply because he had untreated PTSD and related issues. Rather what is clear is that these factors created destructive changes in Tatum that changed him into the person his wife and mother saw–the man who lost his moral compass and reacted in the ways documented by Dr Gould. He is not innocent, and he is responsible. But his punishment must consider why this happened.

The second factor  is his massive rehabilitation. It is documented in the changes in his life seen by all who know him. The eight years since the crime and almost six years since his plea gives the Court the ability to see the magnitude and sincerity of this rehabilitation.

20

Counsel raises three more factors. The first is that any term of imprisonment will have harsher effects on this defendant than most sentenced to prison. He is a police officer. And he is a snitch, a cooperator with the government. Either puts him in danger in prison—both greatly increase that danger. He will likely be placed in protective segregation—a form of isolation for the entire term of his incarceration with less freedom and human contract than other inmates. His incarceration will also create difficulties and added expense for the  prisons  and individuals charged with protecting him while in prison.

Imprisonment will have a serious and harsh effect on his three daughters. Since leaving the police force he has bonded with them and become, according to his wife, central in their lives. They are at a time in their life when they really need their dad. And his third daughter, though older, has only recently had a father in her life with whom she is now very close. And Wyatt Denno does not know what he will do without his new father figure in his life. One can say Tatum should have thought of this when he committed the crime—but the man who committed the crimes is not the same man and father that exists today.

Mr Tatum met with the US attorneys and law enforcement officers for many hours both before his plea, and in preparation for the codefendants trial. Mr Tatum testified truthfully over a period of days about all involved in this crime. He provided the identity of a key witness who also testified at  the trial. The Government has acknowledged to counsel that they will file a 5K motion and will request a substantial reduction in Tatum's sentence. As a matter of law this fact was not considered by the Probation officer in requesting the variance to 24 months.

In fairness to Mr Tatum the Court must determine the variance without considering the  5k reduction. . Only then should the Court  determine the extent of  the 5K reduction. To minimize the variance because there is knowledge that the sentence will again be

lowered by the 5K is simply unfair and in violation, at a minimum , of the spirit of the law The variance and 5K reduction are separate , arise out of unrelated sentencing sections, and serve very different sentencing purposes.

The totality of factors in this case, and what Tatum has done since his arrest, raises a very real question: what will be the purpose of imprisonment in this case?  Jacy Tatum has been punished—he has lost his career and job he loves, his friends,  his role in his community he worked so hard to earn. He has proven he can live a law-abiding life under supervision. He has demonstrated, not just mouthed the words,  his deep remorse. He has made very positive changes in his life—in his role as a father, husband, friend, member of his community and as a mature caring adult. He has gained humility and insight and has begun to conquer his demons. Imprisonment can only alter some of these positive changes, and it never furthers rehabilitation.

Placing Mr Tatum in prison will serve   nothing other than an alleged need  for punishment – he has already lost a great deal because of his actions and has made profoundly rehabilitated.  For all the reasons argued in the Memorandum,  Mr Tatum is requesting a sentence requiring no custodial time in prison. He will be placed on probation with terms including 18 months home detention (with electronic monitoring if the Court believes it is necessary) and as many hours of community service as the Court feels is necessary,

DATED:MAY 2, 2026

_____/s/_____

STUART HANLON
Counsel for Defendant Brendan Jacy Tatum